

SEALED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

IN THE MATTER OF THE SEARCH OF       Case No.   2:23-mj-00122
the premises known as:
T&K Grocery                          <u>Filed Under Seal</u>
2524 Marrowbone Creek Rd.
Kermit, WV 25674

### <u>AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT</u>

I, GRANT E. FRIDAY III, being duly sworn, do hereby depose and state as follows:

### <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as T&K Grocery, 2524 Marrowbone Creek Rd, Kermit, WV 25674, hereinafter "PREMISES," further described in Attachment A, and to seize evidence, fruits, and instrumentalities related to the unlawful presentation of Electronic Benefit Transfer (EBT), Supplemental Nutrition Assistance Program (SNAP) benefits for payment or redemption, in violation of Title 7, United States Code, Sections 2024 (b) and (c).

2.      I am a Special Agent with the United States Department of Agriculture ("USDA"), Office of Inspector General ("OIG"), and have been so employed since July 2010. I am currently assigned to the Pittsburgh, Pennsylvania resident office. Prior to my position with USDA-OIG, I was a Special Agent for the United States Department of Homeland Security, Immigration and Customs Enforcement ("US ICE") from March 2003 to July 2010. As a USDA Special Agent, my responsibilities include investigating violations of laws relating to programs sponsored by the USDA, including investigations involving unlawful SNAP trafficking. During my employment with the USDA, I have been involved in numerous investigations of suspected violations of SNAP laws, serving as the lead agent in over forty SNAP fraud cases. Through my training and field work at USDA, I am familiar with techniques used by those who participate in SNAP fraud. As a

federal agent, I have participated in the execution of numerous search warrants and have served as the affiant for affidavits that resulted in the issuance of over 100 federal search warrants, approximately forty-seven of which related to investigations of SNAP fraud.

3.      The statements contained herein are based in part on information provided by other law enforcement personnel and individuals with knowledge of the alleged violations being investigated. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## THE FEDERAL SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM AND THE STATUTE

4.      Congress established the Federal Food Stamp Program in 1977 for the purpose of alleviating hunger and malnutrition. In 2008, the program was renamed the Supplemental Nutrition Assistance Program ("SNAP" or "the Program"). The Program uses tax dollars to subsidize low-income households, helping low-income individuals and families to maintain more nutritious diets by increasing the food purchasing power of eligible households.

5.      The USDA Food and Nutrition Service ("FNS") administers the Program through retail food stores that have been approved for participation in the Program to sell food in exchange for SNAP benefits. Under Chapter 51, Title 7 of the United States Code, and regulations issued thereunder, a business that accepts SNAP benefits must do so only in connection with retail sales of eligible food products and must be authorized by FNS as a retail food store. According to USDA regulations, most edible items, except for hot prepared foods, vitamins, and medicines, are eligible for purchase with SNAP benefits. Items such as beer, cigarettes, gasoline, household goods, and health and beauty products are ineligible for purchase with SNAP benefits. Federal law specifies that a purchase made utilizing the Program benefits must be tax exempt. In addition, SNAP benefits may not lawfully be exchanged for cash or used to pay off credit accounts or loans.

6.      To participate in the Program, the owner/operator of a retail food store must first

2

apply for authorization and complete an application in which the applicant identifies the retail food store's address, hours of business, estimated or actual gross sales and food sales, ownership and other pertinent information. In addition, before a store can redeem SNAP benefits, the store's owner or a designated representative must either attend an orientation class or watch an instructional orientation DVD that is mailed to the retail food store with its SNAP license. (Orientation classes have not been performed by FNS in several years. Therefore, recently authorized stores did not have the option of an in-person class.) The pertinent rules and regulations relating to the Program are explained at the orientation class, in the instructional DVD, and in a written "Training Guide for Retailers" provided to the retailer upon authorization. The "Training Guide for Retailers," Retailer Training Video, and SNAP Regulations are also available for review on the FNS SNAP website. In the application itself, a summary of pertinent Program rules and regulations are listed in bullet-point format on the last page. The listed rules advise the applicant that it is a violation of program regulations to exchange SNAP benefits for cash, to accept SNAP benefits as payment for ineligible items, or as payment on credit accounts or loans. A retail applicant is required to certify his/her understanding of the listed rules and regulations by signing directly below the listed rules.

7.      Once authorized to participate in the Program, the retail store establishes an account with an EBT processor and receives a terminal for processing (swiping) EBT cards. The EBT processor electronically deposits the proceeds from SNAP transactions into the participating retail store's bank account.

8.      EBT SNAP recipients are issued a card, similar to a debit card or ATM card. To make an eligible food purchase, the recipient's EBT card is swiped through an EBT terminal authorized to the retailer pursuant to the Program. After the recipient enters a Personal Identification Number ("PIN"), the EBT terminal verifies the PIN, determines whether the

3

recipient's account balance is sufficient to cover the proposed purchase and informs the retailer

whether the transaction should be authorized or denied. If the transaction is authorized, the amount

of the purchase is deducted electronically from the SNAP benefits reserved for the recipient. The

retailer subsequently is paid the amount of the EBT purchase through an electronic transfer of

funds from the United States government through the EBT processor to the retailer's designated

bank account. The USDA maintains a report of all retailers' SNAP redemptions.

9.      Title 7, United States Code, Section 2024 provides, in pertinent part:

(b) [W]hoever knowingly uses, transfers, acquires, alters, or possesses benefits in any manner contrary to this chapter or the regulations issued pursuant to this chapter shall, if such benefits are of a value of $5,000 or more, be guilty of a felony and shall be fined not more than $250,000 or imprisoned for not more than twenty years, or both, and shall, if such benefits are of a value of $100 or more, but less than $5,000, or if the item used, transferred, acquired, altered, or possessed is an [sic] benefit that has a value of $100 or more, but less than $5,000, be guilty of a felony and shall, upon the first conviction thereof, be fined not more than $10,000 or imprisoned for not more than five years, or both . . . .

(c) [W]hoever presents, or causes to be presented, benefits for payment or redemption of the value of $100 or more, knowing the same to have been received, transferred, or used in any manner in violation of the provisions of this chapter or the regulations issued pursuant to this chapter, shall be guilty of a felony and, upon the first conviction thereof, shall be fined not more than $20,000 or imprisoned for not more than five years, or both . . . .

Title 7 C.F.R. § 278.2 states food stamp coupons may be accepted by an authorized retail food

store only in exchange for eligible food and prohibits an authorized retail food store from accepting

food stamp coupons for any other nonfood use. Title 7 C.F.R. § 278.2(f) states SNAP benefits

shall not be accepted in payment for items sold to a household on credit. Title 7 C.F.R. § 271.2

defines "coupons" as, among other things, access devices, including [an] electronic benefit transfer

card.

10.     As a result of my training and experience, I have become familiar with a number of

schemes employed by individuals and entities to defraud the Program, these schemes are known

as SNAP trafficking. SNAP traffickers may purchase EBT SNAP benefits at a rate less than their

full value, typically 50 to 70 percent. For example, a retailer illegally purchasing EBT SNAP benefits would buy $100.00 in SNAP benefits for $50.00 in cash. In some cases, a SNAP trafficker may charge a flat fee to exchange SNAP benefits for cash. SNAP traffickers may also allow customers to purchase "ineligible" nonfood items with SNAP benefits. Additionally, retailers engaging in SNAP fraud may allow customers to purchase food and/or ineligible non-food items on credit. These retailers would then allow the customer to pay off credit accounts at a later time with SNAP benefits. Often times retailers that extend credit to their customers charge higher amounts for the items placed on credit, charge interest, and/or charge extra fees.

11.     To monitor traditional SNAP fraud by authorized retail stores, the Program uses a computer system referred to as "ALERT," or the Anti-fraud Locator using EBT Retailers' Transactions. Through ALERT, the USDA can monitor and track every electronic transaction completed by a SNAP recipient and/or authorized retailer. The monthly transactions of participating retail stores are then scanned to identify fraudulent transaction patterns. As such, ALERT flags transactions based on specific fraud indicators and can generate reports of ALERT findings.

12.     I also know from my training and experience that retailers engaged in fraud against the Program will often unlawfully maintain custody of benefit recipients' EBT cards for a period of time in an effort to deceive program administrators and law enforcement. Retailers will deduct SNAP benefits from EBT cards using multiple transactions over extended periods of time, believing that this technique will make those fraudulent transactions appear legitimate. For example, a retailer will provide a benefit recipient with a negotiated sum of cash in exchange for a sum of SNAP benefits; the retailer will then hold the EBT card, deduct the benefits negotiated over several days, and then return the card to the recipient at a later time. Retailers engaged in this activity do so because a one-time transaction of $400, for example, would draw more scrutiny

from program administrators and/or law enforcement than would eight $50 transactions over the course of several days. In some cases, retailers may complete these multiple smaller transactions back to back all at one time, again believing it will draw less scrutiny than one large transaction.

13.     Retailers engaged in SNAP trafficking are often careful to deal with customers who they are comfortable with and know well. In your affiant's experience, retailers defrauding the Program frequently respond to local SNAP enforcement actions (i.e. search warrants at nearby retailers, arrests of other store owners) by changing their methods or become more cautious who they deal with. It is common for a retailer to refuse to do a fraudulent EBT transaction with an unfamiliar customer.

## THE INVESTIGATION

14.     On July 22, 2020, Robert Tyler HODGE (hereinafter "HODGE") filed an application with FNS to accept SNAP benefits as the Owner of T&K Grocery, a Limited Liability Company located at 2524 Marrowbone Creek Rd, Kermit, Mingo County, WV 25674. The application listed the Store as having three registers. The store is moderately stocked and classified by FNS as a convenience store. HODGE was the only owner listed on the application. T&K Grocery will be referred to hereinafter as "T&K" or "the Store."

15.     According to FNS records, HODGE received authorization from FNS to accept and redeem SNAP benefits on or about September 17, 2020. On his application to FNS, HODGE estimated eligible food sales of approximately $35,833 per month and non-food sales of $47,500 per month. HODGE signed the FNS application that he agreed with the conditions of participation, outlined above his signature, and agreed to comply with all statutory and regulatory requirements associated with participation in SNAP, which prohibits authorized retail food stores from exchanging EBT SNAP benefits for cash, ineligible items, or accepting EBT SNAP benefits as payment on credit accounts or loans.

6

16.     An October 2021 application submitted by T&K to accept and redeem Special Supplemental Nutrition Program for Women, Infants, and Children (WIC) benefits identified the store as a fifty-fifty partnership between HODGE and Kenneth SALMONS (hereinafter "SALMONS"). HODGE was listed as the primary contact for the store.

17.     In early 2021, the FBI received information from the Mingo County Sheriff Department ("MCSD") that T&K Grocery may be committing SNAP fraud. MCSD received information from two related witnesses that T&K allowed customers to purchase gasoline, cigarettes, and beer using their "welfare card."   The witnesses also identified multiple individuals that were paying rent to Kenneth SALMONS using their "welfare card."   MCSD reported that SALMONS had been listed on T&K's business license but was removed in early 2021.

18.     In May of 2021, the West Virginia Office of the Inspector General received a complaint that T&K, "owned by Tyler Hodge and Kenneth Sammons [sic]," was allowing customers to "run tabs" (make purchases on credit), and purchase beer, cigarettes, and hot food with SNAP benefits. The complainant further stated that T&K keeps cigarettes bearing the Kentucky tax stamp under the register for sale at a discount to SNAP customers. Cigarettes bearing the West Virginia tax stamp are kept in the normal rack for sale to regular customer.

19.     In June of 2021, the FBI and MCSD re-interviewed one of the witnesses referenced in paragraph 17 above. The witness stated that SALMONS and HODGE have owned T&K almost a year. The witness stated that he/she could buy anything at T&K using SNAP benefits. The witness was first aware of this when told directly by HODGE. The witness further stated that he/she knew of people exchanging SNAP benefits for cash at T&K as well as purchasing hot prepared food and paying rent to SALMONS. According to the witness, SALMONS owns all of the mobile homes located behind T&K.

20.     In September of 2021, the FBI interviewed a cooperating human source ("CHS1") who provided information regarding T&K. CHS1 has one misdemeanor conviction in 2009 related to Disorderly Conduct. Your affiant is not aware of CHS1 assisting law enforcement prior to this investigation. CHS1 stated that HODGE and SALMONS have owned T&K for the last two years. CHS1 stated that T&K will allow anyone they know to use SNAP benefits to pay for gasoline, cigarettes, hot food, THC marijuana buds, CBD products, bubble pipes, and beer. CHS1 reported that he/she previously had a falling out with an employee at T&K and that HODGE was familiar with CHS1.

21.     On November 10, 2021, under the direction, supervision, and surveillance of investigators, CHS1 attempted to conduct a fraudulent SNAP transaction at T&K. The transaction was recorded. CHS1 entered T&K and asked the clerk for ineligible non-food items and attempted to pay for them with SNAP benefits. The clerk told CHS1 that she didn't know if "he" would do it "on food stamps." The clerk left the register to check and returned to tell CHS1, "I can't do it."

22.     In February of 2022, the FBI interviewed a cooperating human source ("CHS2"). CHS2 has no known criminal convictions. The FBI contacted CHS2 as a result of CHS2 passing a bad check for which CHS2 has not been charged. Your affiant is not aware of CHS2 assisting law enforcement prior to this investigation. CHS2 stated that he/she had a friend ("RB") that shops at T&K with a SNAP card. RB told CHS2 if CHS2 ever needed to buy gas, cigarettes, or anything else from T&K Grocery using SNAP benefits, that she (RB) might be able to do it depending on who is working.

23.     On February 23, 2022, under the direction, supervision, and surveillance of investigators, CHS2 conducted a fraudulent SNAP transaction at T&K through RB. The transaction was recorded. CHS2 met with RB and the two drove to T&K. CHS2 provided RB with an undercover (UC) SNAP card and asked RB to get $150 cash, a carton of cigarettes, and toilet

8

paper. In exchange for conducting the transaction, CHS2 told RB that he/she could keep $50 of the cash and a few packs of that were obtained from the transaction. Upon exiting T&K, RB provided CHS2 with $100 cash, six packs of cigarettes, and a 4-roll package of toilet paper. RB also gave CHS2 a non-itemized receipt showing a $232.47 SNAP transaction at T&K. RB had kept four packs of cigarettes and an unverified amount of cash from the transaction. At this point, CHS2 agreed to allow RB to use the EBT SNAP card to purchase chewing tobacco for RB's husband. RB re-entered T&K to purchase the tobacco. Upon exiting T&K the second time, RB gave CHS2 a non-itemized receipt showing a $7.40 SNAP transaction at T&K. CHS2 did not know how much tobacco RB purchased for $7.40. The cigarettes purchased during this UC operation were marked with a Kentucky tax stamp. (It is unlawful for a West Virginia retailer to sell cigarettes bearing a tax stamp from another state. In quantities over 10,000 cigarettes, this would also be a violation of Title 18 USC § 2341.) During this operation, RB told CHS2 that she had tried to use another individual's EBT card the previous day to obtain cash at T&K and was told that she could not use the card for that purpose because someone had recently "reported" T&K.

24.     On March 31, 2022, investigators provided CHS2 with investigative funds in the form of U.S. Currency and directed CHS2 to purchase a carton of cigarettes at T&K. CHS2 entered T&K and purchased one carton (ten packs) of USA Gold Red cigarettes for $60.74 cash. CHS2 turned the cigarettes over to investigators. The cigarettes purchased during this transaction contained the West Virginia tax stamp.

25.     On April 5, 2022, under the direction, supervision, and surveillance of investigators CHS2 attempted to conduct a fraudulent SNAP transaction at T&K. CHS2 traveled to RB's residence to elicit RB's help in conducting the transaction. RB was not home. CHS2 was then directed to attempt the purchase of a carton of cigarettes at T&K with SNAP benefits without the help of RB. CHS2 entered T&K. According to CHS2, HODGE was behind the counter. CHS2

asked HODGE for a carton of cigarettes and attempted to make the payment using a UC SNAP card. HODGE told CHS2 that he could not do the transaction with SNAP benefits.

26.     On September 1, 2022, the West Virginia Department of Health and Human Services (DHHR) Office of Nutrition Services conducted a WIC compliance buy at T&K. During a compliance buy, a DHHR employee working in a UC capacity, observes aspects of WIC program compliance at the Store and completes a WIC purchase. On October 11, 2022, as a result of the compliance buy, T&K was issued a warning letter that detailed observed program violations. The documented violations were administrative in nature and there were no penalties as this was the first warning.

27.     In March of 2023, MCSD relayed information being heard in the community that SALMONS and HODGE had been feuding for several months. Apparently, SALMONS told people that he was cutting ties with HODGE. Supposedly, HODGE was waiting for an insurance settlement to buy out SALMONS portion of T&K.

28.     On April 4, 2023, investigators debriefed a cooperating human source (hereinafter CHS3) regarding T&K. CHS3 has approximately seven misdemeanor convictions that include drug possession and DUI, as well as a conviction for a probation violation. CHS3 currently has pending misdemeanor DUI charges and a felony drug possession charge stemming from one arrest. CHS3 has previously been reliable when assisting the U.S. 119 Task Force. The information and assistance provided by CHS3 to that Task Force resulted in the issuance of one search warrant and two arrests. CHS3 was paid for assistance in this investigation. It should be noted that during later debriefs of CHS3 following UC SNAP transactions, CHS3's descriptions of events or conversations did not always match what was recorded on UC audio/video recordings. The fraudulent SNAP purchases were verified by review of the UC video, review of the electronic EBT system, and review of receipts provided by T&K.

10

29.     During the April 4, 2023, debriefing, CHS3 told investigators that he/she can purchase anything in the Store with SNAP benefits. CHS3 stated all clerks except for one will allow ineligible items with SNAP benefits. CHS3 further stated that in the past he/she exchanged SNAP benefits for cash with HODGE, but that HODGE had stopped doing this about three months ago. CHS3 estimated that last time he/she exchanged SNAP benefits with HODGE was three to four months ago. CHS3 stated that HODGE rarely worked the register and, unprompted, offered that he did this to insulate himself from the SNAP fraud. CHS3 stated that recently HODGE had been spooked by something and would not do any SNAP fraud for about a week. CHS3 stated that HODGE extended credit to customers and would allow customers to repay it with SNAP benefits. CHS3 identified a tenant that paid rent to HODGE with SNAP benefits and stated that he/she believes other renters do this as well but did not know the names. The tenant identified by CHS3 was one of the tenants also named by the witness in paragraph 19 above.

30.     On April 4, 2023, under the direction, supervision, and surveillance of investigators, CHS3 conducted a fraudulent SNAP transaction at T&K. The transaction was recorded. CHS3 entered T&K and purchased two packages of cigarettes, a 12-pack of Smirnoff Ice, a 4-pack of toilet paper, and a hot prepared pizza with SNAP benefits. The clerk debited the UC EBT card for $42.60 in SNAP benefits. This purchase also included an estimated $2.00 in eligible items. CHS3 was provided with a non-itemized EBT receipt that only listed the total amount of SNAP benefits charged.

31.     On April 11, 2023, under the direction, supervision, and surveillance of investigators, CHS3 conducted a fraudulent SNAP transaction at T&K. The transaction was recorded. CHS3 entered T&K and purchased four packs of cigarettes, a 12-pack of Budweiser Select, three cans of cat food, and a 16 oz can of Smirnoff Ice. The clerk debited the UC EBT card for $62.43 in SNAP benefits. This purchase also included an estimated $8.68 in eligible items.

CHS3 was provided with a non-itemized EBT receipt that only listed the total amount of SNAP benefits charged.

32.     On May 3, 2023, under the direction, supervision, and surveillance of investigators, CHS3 entered T&K to conduct a fraudulent SNAP transaction. The transaction was recorded. Upon initially entering the Store, CHS3 inquired about making a purchase using a WIC card. The clerk told CHS3 that only HODGE could conduct WIC transactions and he had to run an errand. CHS3 had previously told your affiant that T&K had a new WIC system, and the clerks did not know how to use it. CHS3 proceeded to select and purchase the following ineligible items using SNAP benefits:

> 1 bottle Hemp Doctor THC Gummies – 20 Gummies, 30mg THC Each
> 1 Case Smirnoff ICE Red, White, & Berry (24 bottles)
> 12-Pack Budweiser Select bottles
> 9-Pack Miller Lite pints
> 6-Pack Sam Adams Octoberfest bottles
> 15-Pack Natty Daddy Beer, cans
> 1 Bottle of Barefoot Fruitscato Wine
> 1 Bottle of Apothic Cabernet
> 1 Bottle of Uptown Pina Colada
> 1 Bottle of Strawberry Margarita
> 4 Packs of Cigarettes
> 1 Bag Purina Kitten Chow 3.15 lb
> 1 Bag Top Cat - Cat Food 14 OZ
> 4    pack Magic Soft toilet paper
> 1 Roll of Bounty Paper Towels

The clerk debited the UC EBT card for $188.80 in SNAP benefits. CHS3 was provided with an itemized receipt. The purchase included $4.48 in eligible items. After completing these purchases, CHS3 took the items to a MCSD vehicle.

33.     After placing the items in the MCSD vehicle, CHS3 re-entered the Store and a clerk got HODGE so that CHS3 could conduct a WIC transaction. During the transaction, HODGE was very specific about what CHS3 could purchase with the WIC benefits and did not appear open to the purchase of non-WIC items with the card. CHS3 purchased an eligible box of cereal and

HODGE debited the WIC card.

34.     Investigators have been unable to make contact with CHS3 since the May 3, 2023, transaction.

35.     On or about May 31, 2023, MCSD received information from another local business owner that HODGE had told his employees that he was selling T&K to Par Mar for $1.5 million. Since that date, MCSD has heard from two sources that HODGE will be running the store through the week of June 19, 2023, or until June 28, 2023. On June 21, 2023, your affiant was advised through FNS that Par Mar has filed a SNAP application for the T&K location stating that the store transfer will occur on June 29, 2023. Regarding the sale of T&K to Par Mar, it is believed that any sales records provided by T&K related to the performance of the business, would be inflated or at least inaccurate due to T&K's history of allowing customers to purchase ineligible items with SNAP benefits. As such, Par Mar would be purchasing T&K based on false representations. As of June 14, 2023, a review of FNS records showed no change or notes in T&K's SNAP profile. Additionally, a query of the address for T&K revealed no new SNAP applications for the location. A review of SNAP activity showed SNAP purchases through T&K's authorization through June 14, 2023. Additionally, although overall redemptions have recently decreased, T&K continues to complete large dollar SNAP transactions including a transaction for $166.13 on June 8, 2023, and a transaction for $380.96 on June 12, 2023.

36.     As of June 14, 2023, a review of FNS records showed no change or notes in T&K's SNAP profile. Additionally, a query of the address for T&K revealed no new SNAP applications for the location. A review of SNAP activity showed SNAP purchases through T&K's authorization through June 14, 2023. Additionally, although overall redemptions have recently decreased, T&K continues to complete large dollar SNAP transactions including a transaction for $166.13 on June 8, 2023, and a transaction for $380.96 on June 12, 2023.

ANALYSIS OF SNAP ACTIVITY

37.     T&K began redeeming SNAP benefits in September 2020. T&K's monthly SNAP redemptions rose rapidly, exceeding $21,000 by the end of February 2021 (slightly over five months). This rise in monthly SNAP redemptions continued to a peak of over $80,000 in August 2022. SNAP redemptions have steadily declined from this peak. During the twenty-seven-month period from February 2021 through April 2023, T&K redeemed approximately $1,547,194 in SNAP benefits, a monthly average of approximately $57,303. SNAP redemptions dropped dramatically to approximately $16,736 for May 2023.

38.     Throughout most of its operation, T&K's individual SNAP transactions have been consistently larger than the state and county average for SNAP transactions of stores classified by FNS as a convenience store. From February 2021 through April 2023, the average individual SNAP transaction for convenience stores in West Virginia was $10.62, and for Mingo County was $13.95. During this period, T&K's average individual SNAP transaction was $29.49, more than double the state and county averages. For comparison, the previous convenience store (MBJ) that operated at T&K's location had an average individual SNAP transaction of $11.50 over the forty-two-month period ending July 2020.

39.     Your affiant compared the SNAP redemptions of T&K with those of other local retailers in proximity to T&K as well as the prior store at the same location (MBJ). The following chart shows this comparison for the twelve-month period ending April 2023:

14

| Store | Store Type | Driving Distance from T&K | Year of Reported Sales | Reported Eligible Annual Food Sales | 12-Month SNAP Redemptions | Percent of Eligible Food Sales |
|---|---|---|---|---|---|---|
| T&K | Convenience | - | 2020 | $430,000[1] | $721,306 | 167.7% |
| MBJ | Convenience | Prior Store | 2017 | $325,771 | $64,733[2] | 19.9% |
| Dollar General | Combination Grocery | 3.2 mi | 2018 | $487,059 | $254,547 | 52.3% |
| Zip Zone 1 | Convenience | 4.9 mi | 2020 | $607,238 | $161,191 | 26.5% |
| Family Dollar | Combination Grocery | 5.0 mi | 2018 | $199,375 | $148,687 | 74.6% |
| Zip Zone 003 | Convenience | 4.9 mi | 2020 | $449,237 | $126,815 | 28.2% |
| IGA | Supermarket | 5.1 mi | 2021 | $4,960,834 | $1,858,451 | 37.5% |
| Dollar General | Combination Grocery | 5.2 mi | 2020 | $2,185,683 | $249,306 | 11.4% |

[1] TK estimated sales on initial SNAP application.
[2] July 2019 - June 2020

40.     The chart shows that T&K has substantially higher SNAP redemptions than other local stores with similar reported eligible food sales. The chart also shows that the percentage of reported sales paid for with SNAP benefits are substantially higher at T&K than other local stores. Additionally, T&K redeemed approximately $291,306 more in SNAP benefits than T&K estimated in eligible food sales. This is not accounting for any eligible food sales being paid for with other payment methods such as cash, debit card, or credit card. In comparison to the prior retailer (MBJ) at the same location, T&K redeemed more than eleven times the amount of SNAP benefits over a twelve-month period.

41.     As described in paragraph 11 above, the FNS ALERT system scans SNAP transaction activity for all authorized retailers. Utilizing preset indicators, ALERT flags transactions that may indicate patterns of SNAP fraud at a retailer. Although ALERT can flag some legitimate SNAP transactions, greater numbers of flags indicate a higher likelihood that fraud is occurring at a retailer. Over the approximately 42-month period from February 2017 through July 2020, ALERT flagged approximately 5% of the SNAP transactions of the previous retailer (MBJ) at T&K's location. Over the approximately 28-months that from February 2021 through

15

May 2023, ALERT flagged approximately 30% of T&K's SNAP transactions. As such, T&K's rate of ALERT flags was approximately six times higher than the previous retailer operating at the same location. Additionally, of the comparison stores listed in paragraph 39 above, the highest percentage of flagged transactions was 5.7%.

42.     Through my training and experience, and through conversations with other experienced USDA-OIG Special Agents, I know that the volume of large dollar transactions seen at T&K is often an indicator of SNAP fraud. A high volume of large dollar SNAP transactions is often consistent with allowing the purchase of ineligible non-food items, exchanging SNAP benefits for cash, and/or payments on store credit accounts. Based on the foregoing, your affiant believes that the SNAP redemption patterns at T&K are not entirely consistent with the legitimate sale of eligible food items within the regulations of the SNAP program.

43.     Based upon my training and experience, I have learned that storeowners and operators who are involved in defrauding the SNAP typically keep records related to sales and expenses on paper and/or in a digital format. Such records often reflect discrepancies between SNAP redemptions, actual merchandise sales, and genuine replenishment of food stocks. Based on my experience, such records are kept in the stores, vehicles, residences, and on the person of individuals involved in defrauding the SNAP program. Specific to this investigation, T&K currently utilizes a computerized cash register system.

44.     During searches related to SNAP fraud investigations, it is routine for USDA-OIG investigators to find EBT cards, and equipment used in connection with EBT card transactions (including, but not limited to, EBT point-of-sale terminal(s) and pin pad(s))-- often connected to the point of sale terminal, card swipe device(s), standalone receipt printer(s), computerized register systems, and other electronic data storage devices/storage media (including, but not limited to, computers, hard disks, flash memory, CD-ROMs, personal data access devices, cellular phones,

and other magnetic or optical media hard drives); SNAP licenses issued by the FNS; ledgers or business records related to SNAP transactions and/or credit accounts, inventory, and sales; bank statements, deposit slips, withdrawal slips and canceled checks providing evidence of the actual income and expenses of the location in question; credit and debit cards drawn on store accounts; invoices regarding actual expenses and transactions of the location, payroll records, tax returns, address books, date books or calendars and phone numbers of vendors/ suppliers; video surveillance recordings/DVRs; safes containing proceeds of the illegal activity, as well as lock-boxes, and safe-deposit box keys for securing bulk cash.

## THE PREMISES TO BE SEARCHED

45.     T&K is a convenience store with a restaurant area, gas station, and has a self-serve car wash located at the PREMISES. The building is located at the intersection of Marrowbone Creek Road and Chariot Drive in Kermit, Mingo County, West Virginia. The building is a commercial building of block, frame, and metal siding construction with gas pumps in front. The building is gray with a red stripe and a red roof. A sign displaying "T&K Grocery" is visible by the road. A photograph of T&K is attached hereto as Attachment A and incorporated herein by reference thereto.

46.     This application seeks authorization to search the entire PREMISES at T&K, that is, the retail store, to include all storage areas, offices, basements, areas utilized in conjunction with operation of the Store, kitchen areas, refrigerators and freezers, and any type of box, safe or other container which could contain records, evidence, fruits and/or instrumentalities of the federal offenses referenced in this affidavit.

## THE ITEMS TO BE SEARCHED FOR AND SEIZED

47.     Based upon the foregoing, your affiant submits there is probable cause to believe that records, evidence, fruits and/or instrumentalities of the offenses may be found at the

17

PREMISES to be searched, to more specifically include: EBT cards; any and all equipment used in connection with EBT card transactions, including: EBT point-of-sale terminal(s), pin pad(s), card swipe device(s), receipt printer(s), computerized register systems, and other electronic data storage devices (including, computers, computer tablets, computer based register systems, digital video recorders, hard drives, cellular/smart phones, and other storage devices); SNAP licenses issued by the FNS; ledgers or business records related to SNAP transactions and/or credit accounts; ledgers or business records related to legitimate inventory and legitimate transactions; bank statements, deposit slips, withdrawal slips and canceled checks in the names of the following businesses and/or their owners/authorized account signers: T&K Grocery, T&K Grocery LLC, Robert Tyler HODGE, Kenneth SALMONS; invoices, payroll records, tax returns, corporation records, address books, date books, and phone records and numbers relating to the conduct of business both legitimate and illegitimate at the PREMISES; United States Currency used to facilitate SNAP trafficking; video surveillance recordings; safes, lock-boxes, and safe-deposit box keys.

### ELECTRONIC STORAGE OF RECORDS AND THEIR RETRIEVAL

48.     This application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. There is reason to believe that there is a computer system currently located on the PREMISES. As noted, T&K utilizes a computerized cash register system. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

49.     I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating systems or application operations, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes

automatically downloaded into a temporary Internet directory or "cache."

**Forensic Evidence: Deleted Files, User Attribution Evidence**

50.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described in the warrant and accompanying affidavit, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

    a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    b.   Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing

a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer, the individual's computer will

generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

51.     In most cases, a thorough search of a location for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the PREMISES, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Imaging and review will be conducted offsite. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on PREMISES could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to

thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the PREMISES. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

## CONCLUSION

52.     I submit that that there is probable cause for a search warrant authorizing the search

of T&K Grocery pictured in Attachment A, to seize the items described in Attachment B.


Respectfully submitted,

_____

GRANT E. FRIDAY III, Special Agent
United States Department of Agriculture
Office of the Inspector General



Sworn and subscribed before me, by telephone
pursuant to Fed. R. Crim. P. 4.1(b)(2)(A),
this ⟨⟨²ⁿᵈ⟩ day of June 2023.



THE HONORABLE DWANE L. TINSLEY
UNITED STATES MAGISTRATE JUDGE

24